U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 6

| 1. Program Code ▮▮▮ | 2. Cross File ☐ | Related Files ☐ ☐ ☐ ☐ ☐ | 3. File No. ▮▮▮▮▮▮▮ | 4. G-DEP Identifier ▮▮▮ |
|---|---|---|---|---|
| 5. By: Daniel R Soeffing, SA  At: Philadelphia FDO | | | 6. File Title ▮▮▮▮▮▮▮▮▮▮ | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | | | 8. Date Prepared  12-21-2015 | |

9. Other Officers: TFO Joe Slobodrian, SA Dan Lang (HHS), Sheri Gillespie (BEI), AUSA Jason Bologna

10. Report Re: Proffer of Jason DILLINGER on 12-21-15

### SYNOPSIS

On 12-21-2015, Assistant United States Attorney (AUSA) Jason Bologna conducted a proffer session with Physician's Assistant (PA) Jason DILLINGER at the U.S. Attorney's Office (EDPA) with DILLINGER's attorneys, David Moscow and Jeremy Alva. Task Force Officer (TFO) Joe Slobodrian, Special Agents (SAs) Dan Soeffing (DEA), Dan Lang (HHS) and Investigator Sheri Gillespie (BEI) attended.

### DETAILS

1. Attorney Alva began the session by advising DILLINGER what a proffer session was and DILLINGER stated that he understood his rights. AUSA Bologna then handed DILLINGER the proffer letter and spoke more about the purpose of the proffer session. DILLINGER again stated that he understood the purpose of the meeting and his rights.

2. AUSA Bologna stated that he wanted to discuss three (3) things: 1) Highland CAMPBELL, 2) Pain Medicine at Advanced Urgent Care (AUC), and 3) the suboxone program at AUC.

3. DILLINGER stated that he was a graduate of Penn State (undergrad) and Barry University (PA Degree in December 2013). DILLINGER stated that he began working at AUC in February 2014 and that it was his first job. DILLINGER stated that he had accepted a new position at Einstein Medical

| 11. Distribution:  Division | 12. Signature (Agent)  Daniel R Soeffing, SA | 13. Date  12-22-2015 |
|---|---|---|
| District | 14. Approved (Name and Title)  /s/ Minh T Nguyen, GS | 15. Date  12-22-2015 |
| Other ▮▮▮▮▮ | | |

DEA Form - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. | 2. G-DEP Identifier |
|---|---|---|---|
| **REPORT OF INVESTIGATION** | | | |
| *(Continuation)* | | 3. File Title | |
| 4. | | | |
| Page   2   of   6 | | | |
| 5. Program Code | | 6. Date Prepared | |
| | | 12-21-2015 | |

Center as a PA in the emergency room(s) (as of January 4, 2015) and that
his last day of employment at AUC would be December 31, 2015.

4. AUSA Bologna asked DILLINGER the difference between a physician and a
physician's assistant at AUC; DILLINGER responded that they were similar
and that their day-to-day operations were identical.

5. AUSA Bologna asked DILLINGER what was required to write a valid
prescription; DILLINGER responded, 1) a valid state medical license, 2)
DEA license (registration), and 3) a diagnostic interpretation.

6. AUSA Bologna asked DILLINGER what practitioners needed to write
a prescription for a drug such as Percocet at AUC.  DILLINGER responded
that to write prescriptions for narcotics at AUC, practitioners needed the
required licenses (state and DEA) and to review patient documents.
DILLINGER stated that PAs are only allowed to write narcotic prescriptions
for a certain timeframe depending on whether the treatment was initial or
on-going, and if on-going, based on what the patient was already
receiving. DILLINGER stated that the AUC requirements regarding
prescriptions were not always met.

7. AUSA Bologna asked why AUC gave additional prescriptions along with the
narcotic pain medications.  DILLINGER responded that other things were
needed, as it was a step-by-step process.

8. AUSA Bologna asked DILLINGER if he (Bologna) was a new patient at AUC,
what pain medicine could he (Bologna) receive. DILLINGER responded that
DILLINGER would only give out three (3) days' worth of pain medicine to a
new patient; however, up to 20 days' worth to an on-going patient.

9. DILLINGER stated that he would work at AUC locations as the only
practitioner 80% of the time until the last three (3) months (October,
November, December 2015) where he was working as the only practitioner
100% of the time. DILLINGER stated that he had access to a physician for
help via telephone, and that he would contact Dr. NIKPARVAR-FARD regarding
patients, speaking three (3) to four (4) times per week for less than 10
minutes total each week.

---

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| REPORT OF INVESTIGATION<br>*(Continuation)* | | 1. File No. | | 2. G-DEP Identifier |
|---|---|---|---|---|
| | | 3. File Title | | |
| 4.<br>Page   3   of   6 | | | | |
| 5. Program Code | | 6. Date Prepared<br>12-21-2015 | | |

10. DILLINGER stated that at the beginning of his employment he would speak with Dr. Cindy FINKELMAN and Dr. Vincent THOMPSON, as well.

11. AUSA Bologna asked DILLINGER if he knew Dr. Highland CAMPBELL and under what circumstances.  DILLINGER responded that Dr. CAMPBELL had been his (DILLINGER's) mentor and that he had last seen CAMPBELL in March or April of 2015 at the City Line Ave AUC.

12. DILLINGER stated that there was a period where Dr. CAMPBELL had left AUC because according to JoAnn RIVERA, CAMPBELL's medical license had been suspended. CAMPBELL returned approximately six (6) months later and began working again in the winter of 2014, leading DILLINGER to conclude that the state license had been restored. DILLLINGER had been made aware, however, by RIVERA and CAMPBELL that CAMPBELL's DEA Registration was not valid. DILLINGER stated that CAMPBELL told DILLINGER the licensing problem evolved from poor legal advice and a paperwork issue concerning the proper reporting of a marijuana arrest to medical board personnel.

13. AUSA Bologna asked DILLINGER who knew CAMPBELL's DEA Registration was suspended and DILLINGER responded: 1) JoAnn RIVERA, 2) Dr. Mehdi NIKPARVAR-FARD, 3) Dr. Vincent THOMPSON, 4) PA Mitchell WHITE, 5) Dr. Highland CAMPBELL, 6) Dr. Matthew DEGIROLAMO, 7) Dr. Mark RADZIEWICZ, 8) Amara MIDDLEMAN, 9) Caitlin BOSE, and possibly 10) PA Samantha HOLLIS.

14. DILLINGER stated that he would speak with RIVERA frequently regarding CAMPBELL's registration and that days turned to weeks and weeks to months as they waited for CAMPBELL to receive a new or valid DEA Registration. DILLINGER stated that upon asking on a status, RIVERA had responded to him (DILLINGER) that CAMPBELL was in Harrisburg on that specific day getting his DEA Registration. DILLINGER would pre-sign blank prescription pads and give half the pad to CAMPBELL for daily use, keeping the other half for himself.  DILLINGER stated that CAMPBELL would see patients and prepare the prescription (much like a trainee would do in a learning environment). DILLINGER stated that he (DILLINGER) would then review the patient charts to make sure the file looked good in case anyone like AUSA Bologna ever reviewed it.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. ▓▓▓▓▓▓▓ | 2. G-DEP Identifier ▓▓▓▓▓ |
|---|---|---|
| | 3. File Title ▓▓▓▓▓▓▓▓▓▓ | |
| 4. Page 4 of 6 | | |
| 5. Program Code ▓▓▓▓ | 6. Date Prepared 12-21-2015 | |

15. DILLINGER stated that he rarely reviewed the medical information and simply signed off on the patient charts where he (DILLINGER) had not seen the patients and CAMPBELL had prepared the prescription. DILLINGER said he could not recall an instance where he reviewed a chart and decided there was an error made and a CAMPBELL prescription (signed by DILLINGER) should be voided.

16. DILLINGER estimated that he provided CAMPBELL with 20-25 pre-signed prescriptions each time they worked together for a total of 250-300 narcotic prescriptions which were pre-signed by DILLINGER and given to patients who saw CAMPBELL.

17. DILLINGER stated that Mitchell WHITE expressed concern to him (DILLINGER) that they were providing pre-signed prescriptions to CAMPBELL; however, Dr. DEGIROLAMO did not seem to mind it.

18. AUSA Bologna asked DILLINGER why he provided pre-signed prescriptions to CAMPBELL in this manner for this long. DILLINGER responded that he was doing a favor for a friend. AUSA Bologna asked if practitioners received bonuses from AUC if they saw a certain number of patients per day. DILLINGER responded that there was a $200 bonus for seeing 50 patients in one day but could not recall if he (DILLINGER) received any direct benefit regarding bonuses from CAMPBELL seeing patients.

19. DILLINGER stated, "He (CAMPBELL) saw the patient, he did everything with the patient. I'm not seeing the patient. I'm not doing anything."

20. DILLINGER stated that physicians were paid $100 per hour and physician assistants were paid approximately $50 per hour at AUC. DILLINGER stated that he believed CAMPBELL was paid at the physician assistant rate during the time he had no valid DEA Registration.

21. DILLINGER estimated the cost of a visit to AUC as being $79 to $110 with Dr. CAMPBELL's share of profit making estimated at $2,000 daily.

22. TFO Slobodrian asked DILLINGER if he read the charts or just signed the charts. DILLINGER stated he just signed the charts so the paperwork would be "correct." DILLINGER added that the person who signed the

DEA Form   - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| | 1. File No. | 2. G-DEP Identifier |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | |
| | 3. File Title | |

| 4. Page  5  of  6 | |
|---|---|
| 5. Program Code | 6. Date Prepared 12-21-2015 |

prescription should be the person who signs the chart. DILLINGER later stated, "I signed the charts to make it look good."

23. DILLINGER stated that he was a big "stickler" for urinalysis levels and would correct them; however, DILLINGER expounded that the situation became "uncomfortable."

24. DILLINGER stated that he last saw Dr. CAMPBELL in March or April of 2015 and that Dr. CAMPBELL was becoming more and more unreliable. DILLINGER stated he (DILLINGER) had left pre-signed blank prescriptions for Dr. CAMPBELL to use and that they were to remain locked at AUC by Amara MIDDLEMAN. DILLINGER stated that he later learned from Caitlin BOSE that Dr. CAMPBELL had stolen the prescriptions and that they had later been recovered at CAMPBELL's home by RIVERA.

25. AUSA Bologna asked DILLINGER what conversations DILLINGER had with Dr. NIKPARVAR-FARD regarding the Highland CAMPBELL matter, specifically since the DEA raid of the AUC facilities. DILLINGER responded that DILLINGER spoke with Dr. NIKPARVAR-FARD via telephone the day of the raids (07-09-15) and NIKPARVAR-FARD asked DILLINGER what he had said and who he had talked to. DILLINGER recalled that he replied to Dr. NIKPARVAR-FARD on that date that he had not said anything to anyone and that NIKPARVAR-FARD advised him that he need not speak to anyone, further stating to DILLINGER, "you saw all the patients, right? You told them (investigators) you went into the room" [with the patients]. DILLINGER stated that he originally told RIVERA he was going to meet with Investigator Gillespie, but later told RIVERA the meeting had been canceled.

26. DILLINGER stated that sometime later he was told by JoAnn RIVERA to meet with attorneys in downtown Philadelphia. DILLLINGER was also told by Dr. NIKPARVAR-FARD to be brief, because the attorneys charged him (Dr. NIKPARVAR-FARD) $900 per hour. AUSA Bologna established that DILLINGER understood the attorneys he (DILLINGER) met with that day represented Dr. NIKPARVAR-FARD and not DILLINGER. DILLINGER then reported that he (DILLINGER) told the attorneys about his interactions at AUC.

27. DILLINGER stated that sometime afterwards he had contacted Dr. NIKPARVAR-FARD via telephone regarding a patient DILLINGER thought was

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

**U.S. Department of Justice**
Drug Enforcement Administration

| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. ▓▓▓▓ | 2. G-DEP Identifier ▓▓▓▓ |
|---|---|---|
| | 3. File Title ▓▓▓▓▓▓▓▓ | |
| 4. Page 6 of 6 | | |
| 5. Program Code ▓▓▓ | 6. Date Prepared 12-21-2015 | |

being disingenuous. DILLINGER stated Dr. NIKPARVAR-FARD's response was out-of-character and that Dr. NIKPARVAR-FARD was professional and courteous and advised DILLINGER (via the telephone call) to act as a professional and treat the patients respectfully.

28. The proffer session concluded and all parties agreed to speak again regarding the aspects touched upon but not fully explored. AUSA Bologna advised DILLINGER that the session would remain confidential and that DILLINGER should be cautious of third parties inquiring as to DILLINGER's activities.



**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.